PATRICIA ANN CHERIN vs. JOHN CHERIN (No. 1).

No. 07-P-522.

Suffolk. April 7, 2008. - July 30, 2008.

Present: McHUGH, KATZMANN, & GRAINGER, JJ.

*Divorce and Separation,* Jurisdiction. *Jurisdiction,* Probate Court, Personal, Long-arm statute. *Probate Court,* Jurisdiction.

In a divorce action, the Probate and Family Court had personal jurisdiction over the husband, a domiciliary of Virginia, pursuant to the Massachusetts long-arm statute, G. L. c. 223A, § 3(g), where the husband committed acts in Massachusetts that gave rise to the wife's claim for divorce; namely, he engaged in a persistent course of conduct that created for the wife the impression that the marriage was ongoing and that he would soon be moving to Massachusetts to retire with her, even though he secretly had no intention of actually doing so. [290-295]

COMPLAINT for divorce filed in the Suffolk Division of the Probate and Family Court Department on July 18, 2005.

The case was heard by *Elaine M. Moriarty,* J., and a motion for attorney's fees was also heard by her.

*William B. Van Lonkhuyzen (Barbara Equen Rodriguez* with him) for John Cherin.

*Patricia Saint James (Alexander D. Jones* with her) for Patricia Ann Cherin.

KATZMANN, J. The husband, John Cherin, appeals a decision of a Probate and Family Court judge awarding the wife, Patricia Ann Cherin, alimony and approximately one-half of the marital estate pursuant to G. L. c. 208, § 34, and attorney's fees pursuant to G. L. c. 208, § 38. We consider here the husband's contention that the court had no personal jurisdiction over him, and therefore could not order alimony and assignment of marital assets. We conclude that there was jurisdiction.[1]

---

[1]The husband raises other issues on appeal, including claims that the judgment with respect to alimony and property division was plainly wrong and

*Background.* The parties were married for thirty-nine years. They married in 1967 in Massachusetts and originally lived in Boston. They adopted one child, named Chiara, in 1975, and had no other children. The husband, a certified public accountant, was employed over the years in various capacities at Arthur Andersen, then a major accounting firm. The wife worked from time to time as a school teacher but, for the most part, was a homemaker. In 1977, they moved to Miami, Florida, when Arthur Andersen transferred the husband to its office in that city. The wife returned to Massachusetts twice, in 1980 and again in 1984, to keep her teaching credentials current, for about one year each time. She brought Chiara with her, but the husband remained in Florida.

In 1985, the husband, then a full partner at Arthur Andersen, was transferred to Virginia, where the couple purchased a home and resided together until 1997.[2] In 1993, the couple had some marital difficulties, and in 1995, both consulted divorce attorneys. They later reconciled.

In August, 1997, the wife moved to Massachusetts with Chiara and obtained a job as a teacher. The husband remained in the marital home in Virginia. The wife rented an apartment, but she found it difficult to pay the rent on her salary alone, so the husband paid a substantial portion of it. The lease was in both their names, and after 2001, the husband took deductions on his tax returns for his portion of the lease payments. Until 2003, though living separately, the parties filed joint tax returns, and they spent most holidays and various other occasions together in Massachusetts. The husband regularly sent the wife cards for her birthday and their anniversary. They corresponded regularly, sending electronic mail (e-mail) messages back and forth discussing financial matters, private jokes, their daughter and her children, their retirement, and plans to purchase a retirement home in Massachusetts. Between 1997 and 2005, they discussed purchas-

---

excessive, and that attorney's fees were improperly assessed. We address those claims in an unpublished memorandum and order also issued this day pursuant to our rule 1:28. See *Cherin* v. *Cherin (No. 2), post* 1110 (2008). None of those claims has merit.

[2]Although the wife was responsible for finding the property that the parties ultimately purchased and was the primary contact for the builder, the wife did not learn until the day of closing that the husband took the title to the Virginia home solely in his name.

ing a retirement home in Massachusetts. The wife carried most of the burden of searching for a home in person; the husband contacted real estate agents via e-mail, reviewed sales listings, and discussed the homes with the wife. Though they considered numerous homes during the period between 1997 and 2005, they were unable to agree upon one, as the husband ultimately rejected all of them.

At trial, the husband argued that the marriage effectively ended in 1997 when the wife moved to Massachusetts, but the judge found that the marriage suffered an irretrievable breakdown on June 30, 2005, when the husband wrote to the wife that if she attempted to return to the marital home in Virginia, as she had been discussing, he would have her charged with trespass. The judge found that until that time the husband had encouraged the wife to believe that he intended to remain married and that the couple would retire together in Massachusetts. The judge reached this conclusion based on the husband's words and conduct between 1997 and 2005, in which he corresponded with the wife regularly in a cordial manner, visited her in Massachusetts for holidays and family events, repeatedly encouraged the wife to continue searching for a retirement home for the two of them to share, and generally maintained the appearance of a marital relationship.

*Discussion.* We turn now to the question whether the court had personal jurisdiction over the husband. In order to issue a support obligation or property division as part of a divorce decree, the court must have in personam jurisdiction over the obligor spouse. *Windsor* v. *Windsor*, 45 Mass. App. Ct. 650, 652 (1998), citing *Kulko* v. *Superior Ct. of Cal.*, 436 U.S. 84, 91 (1978). To establish personal jurisdiction over a nonresident defendant, the plaintiff has the burden of establishing two things: first, that the requirements of the Massachusetts long-arm statute are met, and second, that the constitutional requirements of due process are met.[3] *Good Hope Indus., Inc.* v. *Ryder Scott Co.*, 378 Mass. 1, 5-6 (1979).

The Massachusetts long-arm statute states in relevant part:

"A court may exercise personal jurisdiction over a person,

---

[3]The judge found that the husband met the applicable minimum contacts test for a variety of reasons. The husband does not challenge this on appeal; he only contests personal jurisdiction under the long-arm statute.

who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . (g) maintaining a domicile in this commonwealth while a party to a personal or marital relationship out of which arises a claim for divorce, alimony, property settlement, parentage of a child, child support or child custody; or the commission of any act giving rise to such a claim."

G. L. c. 223A, § 3(g), as amended by St. 1993, c. 460, § 86. In a decision issued after the judge's ruling here, the Supreme Judicial Court interpreted this statute to mean that there are two independent grounds upon which a court may exercise personal jurisdiction upon a party in a divorce proceeding: "one involving maintaining a marital domicil and one involving the commission of any act that gives rise to the stated claim for divorce." *Miller* v. *Miller*, 448 Mass. 320, 328-329 (2007). The second basis "provides personal jurisdiction over an individual who is not domiciled in [Massachusetts] but who committed an 'act' [t]here." *Id.* at 329.

The judge here held that the court had jurisdiction under the first ground, and did so without the benefit of the analysis in *Miller*, which was to follow nearly one and one-half years after the judge's ruling on the husband's motion to dismiss. Citing to a case involving a postdivorce claim, *Akinci-Unal* v. *Unal*, 64 Mass. App. Ct. 212, 216-218 (2005), cert. denied, 547 U.S. 1206 (2006) (which, of course, also predated *Miller*), the judge ruled that the court had personal jurisdiction over the husband to issue alimony and a property settlement against him because the wife's economic claims to alimony and marital assets arose from the existence of the marriage, during which both parties were domiciled in Massachusetts for a significant portion of time. Citing *Windsor* v. *Windsor*, 45 Mass. App. Ct. at 654 (which also preceded *Miller*), the husband counters that the Probate and Family Court did not have personal jurisdiction because he was not domiciled in Massachusetts when the irretrievable breakdown of the marriage occurred. While the husband argues that *Windsor* requires him to have been domiciled in Massachusetts when the irretrievable breakdown of the marriage occurred, in *Miller*, the Supreme Judicial Court noted an ambiguity in the case law surrounding the domicile prong of § 3(g) and specifically left "for

another day a full analysis of the first part of the statute, discussing domicil, *Windsor* v. *Windsor*, 45 Mass. App. Ct. 650 (1998)." *Miller* v. *Miller*, *supra* at 330 & n.11.[4] In any event, we conclude that the husband committed acts in Massachusetts that gave rise to the wife's claim for divorce, and that the court had jurisdiction under the second ground. *Id.* at 330. Therefore, the husband's domicile on the date of the irretrievable breakdown is not material to our determination that jurisdiction lies here. *Ibid.* (§ 3[*g*] does not require both husband and wife to be domiciled in Massachusetts when act giving rise to claim for divorce occurs in Massachusetts).

We note that the fact that for several years the husband and the wife were largely separated geographically does not establish, without more, that the marriage was irretrievably broken. *Caffyn* v. *Caffyn*, 441 Mass. 487, 496 n.20 (2004). Couples often take up separate residences for a variety of reasons and it would "defy common experience to conclude" that a physical separation, by itself, indicates that a marriage has been irretrievably broken. *Ibid.* The judge found that the marriage broke down on June 30, 2005, when the husband sent the wife an e-mail threatening to charge her with trespass if she tried to return to the Virginia marital home. While this may have been the straw that broke the marriage's back, it had already been bearing a heavy load due to the husband's acts and words in the years leading up to that moment. Although the irretrievable breakdown of the marriage occurred on June 30, 2005, the husband committed a series of acts in the years prior to that date that gave rise to the breakdown, some of which occurred in Massachusetts. Those acts must be considered when determining what gave rise to the irretrievable breakdown of the marriage.

The wife testified that when she received the June 30, 2005, e-mail, she was devastated, because until then she had been under the impression that the husband was planning to move to Massachusetts with her so that they could retire together. The judge found that the "[h]usband affirmatively created through words and acts the impression for the [w]ife that he wanted to remain married and retire with her in Massachusetts." Some of these acts

---

[4]Since we determine that there was jurisdiction under the second ground, we, too, leave that discussion for another day.

took place in Massachusetts. The husband assisted the wife's move to Massachusetts by cosigning the lease on her apartment and paying approximately $1,000 per month of her rent between 1999 and 2001, and $2,000 per month between 2001 and 2005. Although the lease described him as a "nonresident tenant," he claimed the portion of the rent that he paid as a deduction on his income tax return on the grounds that he used part of the Massachusetts apartment as a home office for one of his companies, Cherin Global Consulting, LLC. In October, 2003, the husband, along with the wife, offered to have Chiara and her husband stay in the wife's apartment. In 2004, the husband and the wife jointly registered a 1997 Lexus automobile in Massachusetts.[5]

Additionally, between 1997 and 2004, the husband and the wife spent most holidays and family events together in Massachusetts, including the parties' anniversary, family birthdays, Mother's Day, Father's Day, Thanksgiving, Christmas, Chiara's 2002 wedding,[6] the birth of Chiara's first child, and on at least one occasion, the Fourth of July. While in Massachusetts, the husband would take the wife out to dinner and buy her gifts.[7] The husband would usually stay in Boston for several days, at the couple's jointly leased apartment, when he made these visits.[8] While in Boston, the wife, the husband, Chiara, and Chiara's husband would spend time together as a family; they would go out to eat, go to movies, visit museums, and so on. Sometimes the husband and the wife would go out with family friends together. Although the wife did most of the work searching for a retirement home in person, the husband would participate oc-

---

[5]Although the husband was in Virginia at the time, e-mail correspondence between the parties indicates that the husband directed the wife to sign his name to the back of the title to the car. The judge took this evidence into account in finding not credible the husband's testimony that the wife forged his signature.

[6]On the day of this wedding, which the husband and the wife planned together, the husband had the wife sign a joint Federal tax return for 2001. The husband and the wife sat together at the wedding reception and presented themselves to the guests as a married couple.

[7]The judge found that during these visits, many things were charged to the husband's credit card from Massachusetts stores and restaurants.

[8]Although the husband did not leave a "closet full of clothes" at the wife's apartment, he would leave behind certain personal belongings such as toiletries, jackets, trousers, and winter clothes.

casionally while he was visiting, such as in September, 1997, when he and the wife drove around looking for houses in the Chestnut Hill section of Newton, and in June, 2004, when they looked at houses in Newton and Brookline.

Having heard the testimony of the husband and the wife, and having assessed their credibility, the judge's findings were within her discretion: essentially, the husband engaged in a persistent course of conduct, by committing various acts in Massachusetts, which created for the wife the impression that the marriage was ongoing and that he would soon be moving to Massachusetts to retire with her, even though he secretly had no intention of actually doing so.[9] It was this pattern of deception that made his June 30, 2005, e-mail, in which he revealed his true intent, so devastating,[10] ultimately giving rise to the irretrievable breakdown of the marriage and the wife's claim for divorce, alimony, and property settlement. See *Tatro* v. *Manor Care, Inc.*, 416 Mass. 763, 771 (1994) ("arising from" language in G. L. c. 223A, § 3[a], should be interpreted "broadly"). In short, the June 30, 2005, communication unmasked that the husband had engaged in a pattern of deception in Massachusetts during the previous years, and ultimately destroyed the wife's expectation of a continuing

[9]Under other provisions of the long-arm statute, Massachusetts courts have found that an intentional misrepresentation made in or sent into Massachusetts, for the purpose of inducing the plaintiff's reliance, constitutes an act within the Commonwealth. See *Burtner* v. *Burnham*, 13 Mass. App. Ct. 158, 163-164 (1982) (personal jurisdiction over real estate agent, a New Hampshire resident, under G. L. c. 223A, § 3[c], where agent knowingly misrepresented size of parcel and plaintiffs relied upon misrepresentation); *Rye* v. *Atlas Hotels, Inc.*, 30 Mass. App. Ct. 904, 906 (1991) (out-of-State defendant's attorney's intentional misrepresentations by telephone and mail sufficient to provide jurisdiction under § 3[c]). See also *Murphy* v. *Erwin-Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1972) ("Where a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state"); *Salvador* v. *Meese*, 641 F. Supp. 1409, 1414 (D. Mass. 1986) (knowing misrepresentation of ownership by out-of-State defendant constituted basis for personal jurisdiction); *LaVallee* v. *Parrot-Ice Drink Prods. of Am., Inc.*, 193 F. Supp. 2d 296, 300 (D. Mass. 2002) ("it is well established that fraudulent misrepresentation is a sufficient basis for jurisdiction under § 3[c]").

[10]Evidence of the wife's surprise can be found in a June 22, 2005, e-mail from her to the husband in which, after learning from Chiara that the husband said he would have to move out of the Virginia marital home if she tried to move back in, she wrote to the husband that she was "hurt, very hurt, and then angry," and that she "had not expected this."

marital relationship in Massachusetts. Therefore, based on the second ground of § 3(*g*), the Probate and Family Court had personal jurisdiction over the husband.

> *Judgment nisi dated August 22, 2006, affirmed.*
>
> *Order on motion for attorney's fees dated October 2, 2006, affirmed.*